## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOSEPH C. KUPFER,**

      **Plaintiff,**

    **vs.**                                             **Civ. No. 22-619  JFR**

**KILOLO KIJAKAZI, Acting Commissioner,**
**Social Security Administration,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

      **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 10)[2] filed January 17, 2023, in connection with Plaintiff's *Opposed Motion to Reverse and Remand,* filed March 23, 2023, 2022.  Doc. 16.  Defendant filed a Response on June 22, 2023. Doc. 23.  Plaintiff filed a Reply and Notice of Completion of Briefing on July 6, 2023.  Docs. 24 and 25.  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that Plaintiff's motion is not well taken and is **DENIED**.

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 3, 5, 6.)

[2] Hereinafter, the Court's citations to Administrative Record (Doc. 10), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

## I.  Background and Procedural Record

Plaintiff Joseph Kupfer (Mr. Kupfer) alleges he became disabled on July 15, 2010, at the

age of forty-seven years and one month, because of post-traumatic stress disorder (PTSD),

bipolar II, anxiety, major depression, panic attacks, osteoarthritis, enlarged heart, pectus

excavatum, asthma, and double hernia.  Tr. 63-67.  Mr. Kupfer graduated from high school in

1981.  Tr. 246.  Mr. Kupfer owned a lobbyist and public relations business and met with elected

officials and clients/businesses to influence legislation and budget issues.  Tr. 236-37.

Mr. Kupfer also briefly owned a security company.  Tr. 236.  Mr. Kupfer stopped working on

November 15, 2012, after working for a friend and the job ended.  Tr. 246.  Mr. Kupfer believes

his conditions prevented him from working on July 15, 2010.  *Id.*  Mr. Kupfer's date of last

insured is June 30, 2015.[3]  Tr. 253.

On November 26, 2019, Mr. Kupfer protectively filed an application for Social Security

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42

U.S.C. § 401 *et seq*.  Tr. 193-94.  On April 6, 2020, Mr. Kupfer's application was denied.  Tr.

63-69, 70, 79-82.  On April 30, 2021, it was denied again at reconsideration.  Tr. 71-77, 78, 90-

91.  Upon Mr. Kupfer's timely request, Administrative Law Judge (ALJ) James Cole Cartledge

held a hearing on November 21, 2021.  Tr. 36-62.  Mr. Kupfer appeared with attorney

representative Preston Flood.[4]  *Id.*  On February 3, 2022, ALJ Cartledge issued an unfavorable

decision.  Tr. 13-28.  On July 22, 2022, the Appeals Council denied Mr. Kupfer's request for

---

[3] To qualify for DIB, a claimant must establish that he met the statutory requirements for disability on or before his date of last insured. *See* 42 U.S.C. §§ 416(i)(3), 423(c)(1); *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010).

[4] Mr. Kupfer is represented in these proceedings by Attorney Benjamin Decker.  Doc. 1.

review.  Tr. 1-5.  On August 19, 2022, Mr. Kupfer timely filed a Complaint seeking judicial review of the Commissioner's final decision.  Doc. 1.

## II.  Applicable Law

### A.  Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals).  The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

> (1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[5]  If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.
>
> (2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, he is not disabled.
>
> (3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.
>
> (4) If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must

---

[5] Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a).  "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. §§ 404.1572(b).

determine at step four whether the claimant can perform his "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5) If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n.5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

### B.    Standard of Review

The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might

4

accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118.  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Further, the decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).  In undertaking its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the agency.  *Langley*, 373 F.3d at 1118.

### III.  Analysis

The ALJ determined that Mr. Kupfer met the insured status requirements of the Social Security Act through June 30, 2015, and that he had not engaged in substantial gainful activity during the period from his alleged onset date of July 15, 2010, through his date last insured.[6]  Tr. 19.  He found that through the date last insured, Mr. Kupfer had severe impairments of depression, anxiety and PTSD.  Tr. 19.  The ALJ also found that Mr. Kupfer had nonsevere impairments of pectus excavatum and asthma.  *Id.*  The ALJ determined that Mr. Kupfer's impairments did not meet or equal in severity any of the listings described in the governing regulations, 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 20.  Accordingly, the ALJ proceeded

---

[6] The ALJ noted that Mr. Kupfer worked after his alleged onset date, but that his work activity did not rise to the level of substantial gainful activity.  Tr. 18.

to step four and found that Mr. Kupfer had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that

> [c]laimant had to avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, etc., and hazards.  The claimant was limited to SVP 1 and 2 level occupations and the performance of simple, routine and repetitive tasks.  The claimant was further limited to occasional interaction with the public, coworkers and supervisors.  The claimant was limited to occasional work setting changes.

Tr. 21.  The ALJ determined that considering Mr. Kupfer's age, education, work experience, and residual functional capacity, that Mr. Kupfer was not capable of performing his past relevant work, but that there were jobs that existed in significant numbers in the national economy that Mr. Kupfer could have performed.[7]  Tr. 26-27.  The ALJ determined, therefore, that Mr. Kupfer was not disabled prior to his date of last insured.  *Id.*

In support of his Motion, Mr. Kupfer argues that (1) the ALJ erred by failing to determine whether the VE's testimony was consistent with the DOT and did not satisfy his burden to do so at step five of the analysis; and (2) the ALJ failed to consider the consistency of Dr. Hall's opinions with the other evidence of record.  Doc. 16 at 19-18.

For the reasons discussed below, the Court finds that (1) the ALJ's errors in failing to inquire about and resolve any conflicts between a VE's testimony and the Dictionary of Occupation Titles ("DOT") are harmless; and (2) the ALJ applied the correct legal standard in evaluating the medical opinion evidence.  The Court, therefore, will affirm the Commissioner's final determination and deny Mr. Kupfer's Motion to Remand.

---

[7] The VE identified Price Marker, DOT #209.587-034, Light, SVP 2, 129,000 positions in the national economy; Routing Clerk, DOT #222.587-038, Light, SVP 2, 35,000 positions in the national economy; and Mailroom Clerk, 209.687-026, Light, SVP 2, 100,000 positions in the national economy.  Tr. 27.

6

A.    <u>**VE Testimony and DOT**</u>

Mr. Kupfer argues that before an ALJ may rely on expert vocational evidence as substantial evidence, the ALJ has an affirmative duty to ask the expert how his or her testimony as to the exertional and nonexertional requirements of the identified jobs correspond with the DOT.  Doc. 16 at 16.  Mr. Kupfer argues that here the ALJ made numerous conclusions that are not consistent with the DOT including (1) that the occupations require only occasional interaction with the public, co-workers and supervisors; and (2) that the occupations require only occasional work setting changes.  *Id.* at 17.  Mr. Kupfer argues that had the ALJ properly questioned the VE, he would have learned the foundations for her testimony and potentially obtained a reasonable explanation for her opinions that deviate from the DOT.  *Id.*  Mr. Kupfer argues the ALJ summarily adopted the VE's opinions without further investigation or analysis. *Id.*

The Commissioner concedes that the ALJ did not ask the VE at the Administrative Hearing if her testimony was consistent with the DOT.  Doc. 23 at 20.  The Commissioner also acknowledges that one of the jobs the VE identified, the job of mailroom clerk, requires a GED reasoning level of 3 which exceeds the ALJ's assessed limitations of Mr. Kupfer's ability to do work-related mental activities.  *Id.*  The Commissioner contends, however, that the two other jobs the VE identified during the Administrative Hearing, trimmer/price marker and routing clerk, presented no conflicts for the ALJ to address.  *Id.*  The Commissioner further contends that these two remaining jobs sufficiently support that jobs exist in significant numbers in the national economy that Mr. Kupfer can perform such that "[a]ny arguable oversight [] does not affect the outcome in this case."  *Id.*  In sum, the Commissioner asserts that the ALJ's legal errors should be deemed harmless.  *Id.*

In his Reply, Mr. Kupfer asserts that because the trimmer/price marker and routing clerk jobs require "meaningful interaction with supervisors," the ALJ was required to elicit an explanation from the VE about this alleged apparent conflict between the job requirements and the ALJ's assessment of Mr. Kupfer's ability to have only occasional interaction with supervisors.[8]  Doc. 24 at 2.

At step five, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [his] residual functional capacity and vocational factors."  20 C.F.R. § 404.1560(c)(2).  In meeting this burden, the Commissioner may rely on information in the DOT and its companion publication, U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993) (the "SCO"), as well as VE testimony.  *See* 20 C.F.R. § 404.1566(d)-(e) (providing the ALJ reliance on, *inter alia*, DOT and VE testimony); *see also Kimes v. Comm'r, SSA*, 817 F. App'x 654, 658 (10th Cir. 2020) (unpublished) (recognizing SCO as companion publication to DOT that may be considered at step five).

The Tenth Circuit has held that "before an ALJ may rely on expert vocational evidence as substantial evidence to support a determination of nondisability, the ALJ must ask the expert how his or her testimony as to the exertional requirement of identified jobs corresponds with the Dictionary of Occupational Titles, and elicit a reasonable explanation for any discrepancy on this point." *Haddock v. Apfel*, 196 F.3d 1084, 1087 (10th Cir. 1999) (emphasis added).  The Tenth Circuit later clarified that *Haddock's* holding extends to nonexertional limitations.  *See Hackett*

---

[8] In his Reply, Mr. Kupfer also refutes "[t]he case cited by the Administration in support of its position that Taking instructions – Helping is not potentially incompatible with the RFC" (Doc. 24 at 2); however, the case Mr. Kupfer refutes was not cited in the Commissioner's response brief.

*v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005).  In unpublished but persuasive caselaw, the

Tenth Circuit adopted another court's characterization of the ALJ's inquiry burden:

> [T]o the extent that there is any implied or indirect conflict between the vocational
> expert's testimony and the DOT . . . the ALJ may rely upon the vocational expert's
> testimony provided that the record reflects an adequate basis for doing so . . . .  [A]ll
> kinds of implicit conflicts are possible and the categorical requirements listed in the
> DOT do not and cannot satisfactorily answer every such situation.  Moreover,
> claimants should not be permitted to scan the record for implied or unexplained
> conflicts between the specific testimony of an expert witness and the voluminous
> provisions of the DOT, and then present that conflict as reversible error, when the
> conflict was not deemed sufficient to merit adversarial development in the
> administrative hearing.  Adopting a middle ground approach, in which neither the
> DOT nor the vocational expert testimony is *per se* controlling, permits a more
> straightforward approach to the pertinent issue, which is whether there is substantial
> evidence supporting the Commissioner's determination that this particular person
> can do this particular job or group of jobs.

*Gibbons v. Barnhart*, 85 F. App'x 88, 93 (10th Cir. 2003) (unpublished) (quoting *Carey v. Apfel,*

230 F.3d 131, 146-47 (5th Cir. 2000)); *see also, e.g., Kyle Edward Victor G. v. Saul*, No. 19-cv-

2518-JWL, 2020 WL 3960422, at *9 (D. Kan. July 13, 2020) ("SSR 00-4p requires the ALJ to

address apparent conflicts, not *all* conflicts.").  However, absent any actual conflict, the ALJ's

failure to make such an inquiry is harmless. *See Poppa v. Astrue,* 569 F.3d 1167, 1173 (10th Cir.

2009) ("Although we agree that the ALJ erred by not inquiring about whether there were any

conflicts between the VE's testimony about the job requirements for the jobs identified and the

job descriptions in the DOT, we conclude that this error was harmless because there were no

conflicts.").

At the Administrative Hearing, the ALJ's hypothetical individual was limited, *inter alia*,

to "SVP and GED levels of 1 and 2 occupations, *simple, routine, repetitive tasks*, further limited

to occasional interaction with the public, coworkers and supervisors, limited to occasional work

setting changes."  Tr. 60 (emphasis added).  The VE in turn identified three jobs the hypothetical

individual could perform, *i.e.,* trimmer/price marker, routing clerk and mailroom clerk.  Tr. 60-
61.  Notably, as the Commissioner conceded, the ALJ did not ask the VE whether her testimony
conflicted with the DOT's job descriptions as required pursuant to SSR 00-4p.  *Id.*

In his decision, the ALJ's RFC assessed, *inter alia,* that Mr. Kupfer was limited to "SVP
1 and 2 level occupations and the performance of simple, routine and repetitive tasks.  The
claimant was further limited to occasional interaction with the public, coworkers and supervisors.
The claimant was limited to occasional work setting changes."  Tr. 21.  The ALJ also stated,
without more, that "[p]ursuant to SSR 00-4p, the undersigned has determined that the vocational
expert's testimony is consistent with the information contained in the Dictionary of Occupational
Titles."  Tr. 27.

It is undisputed that the ALJ failed to meet his initial step-five burden to affirmatively ask
whether there were any conflicts between the VE's evidence and the DOT as required by SSR
00-4p.  Although this legal error has been deemed harmless in the absence of any conflicts, that
is not the case here at least with respect to the mailroom clerk position.  Indeed, the
Commissioner acknowledges that the job of mailroom clerk required resolution of an apparent
conflict because it has a GED reasoning level of three and the ALJ's RFC limits Mr. Kupfer to
jobs with reasoning levels of 1 and 2.[9]  Thus, under *Hackett*[10] and SSR 00-4p, the ALJ was

---

[9] The Dictionary of Occupational Titles classifies each job according to its required "General Educational
Development" (GED).  This classification "embraces those aspects of education (formal and informal) which are
required of the worker for satisfactory job performance."  DOT, Components of the Definitional Trailer, Appx. C,
§ III, 1991 WL 688702.  "The GED Scale is composed of three divisions: Reasoning Development, Mathematical
Development, and Language Development."  *Id.*  The "reasoning" scale runs from one to six, with six signaling jobs
that call for the most complex reasoning.  A reasoning level of three indicates a job that requires the application of
"commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and requires
"[d]eal[ing] with problems involving several concrete variables in or from standardized situations."  DOT, Appx. C,
§ III, 1991 WL 688702.

required to evaluate the apparent conflict and, based on his assessment of this conflict, either (1) explain why it was reasonable to conclude that Mr. Kupfer would be able to satisfy the specific characteristics of the jobs at issue despite the apparent conflict between the job requirements and his abilities, or (2) reject the VE testimony due to the conflict.  The ALJ did neither.

The Commissioner acknowledges the ALJ's legal errors, but contends they should fall under the umbrella of harmless error.  The Commissioner contends that because there are no apparent conflicts between the VE's testimony and the DOT provisions for the two remaining jobs, and because the two remaining jobs sufficiently support that jobs exist in significant numbers in the national economy that Mr. Kupfer can perform, that "[a]ny arguable oversight [] does not affect the outcome in this case."  *Id.*

The Commissioner's contentions present two questions.  First, whether the two remaining jobs in fact present no apparent conflicts requiring the ALJ's inquiry, and second, whether the number of jobs based on the trimmer/price marker and routing clerk positions count as significant for harmless-error purposes.  As to the former, Mr. Kupfer argues, without more, that the jobs of trimmer/price marker and routing clerk exceed the ALJ's assessed limitations of Mr. Kupfer's ability to do work-related mental activities, *i.e.,* the ALJ limited Mr. Kupfer to occasional interaction with co-workers, supervisors and the public, and occasional workplace

---

[10] In *Hackett*, the Tenth Circuit found that a limitation to "simple routine work tasks" is more consistent with jobs requiring level two reasoning.  395 F.3d at 1176.  There, the Tenth Circuit agreed with the claimant that there was an apparent conflict between a claimant's inability to perform more than simple and repetitive tasks and the level three reasoning required by the jobs identified.  *Id.*  The Tenth Circuit held that an ALJ may not conclude that a claimant who is restricted to "simple and routine work tasks" can perform a reasoning-level-three job without addressing this conflict.  *Id.*

changes.  Doc. 16 at 17.  Mr. Kupfer also argues that the ALJ should have learned the

foundations of the VE's testimony and "potentially" obtained a reasonable explanation for her

opinions that deviate from the DOT.  *Id.*  Mr. Kupfer's arguments, however, necessarily fail

because the DOT job descriptions reflect that both positions require the lowest level of human

interaction[11] and involve repetitive or short-cycle work.  *See* DOT 209.587-034, 1991 WL

671802, and DOT 222.587-038, 1991 WL 672123.  As such, there is nothing on the face of the

job listings to support an apparent conflict between the ALJ's assessment of Mr. Kupfer's social

and adaptation limitations and the job requirements that necessitated an explanation from the VE.

Because there are no apparent conflicts between the VE's testimony and the DOT's job

descriptions of trimmer/price marker and routing clerk, the Court agrees with the Commissioner

that the ALJ's error in not inquiring about potential conflicts as to these two jobs is harmless.

*Poppa*, 569 F.3d at 1174.

 As to the latter question regarding significant number of jobs, harmless error applies if

"no reasonable factfinder, following the correct analysis, could have resolved the factual matter

---

[11] Mr. Kupfer's argument that the two remaining jobs require "meaningful" interaction with supervisors is not supported.  Appendix B of the DOT specifies that the fourth, fifth, and sixth digits of the code reflect "relationships to Data, People, and Things, respectively ... [and] express a job's relationship to Data, People and Things by identifying the highest appropriate function in each listing shown." *Appendix B—Explanation of Data, People, and Things*, 1991 WL 688701. The "People" category has a range from zero to eight, with zero requiring the highest level of human interaction and eight requiring the lowest. *Id.*; *see also Lane v. Colvin*, 643 F. App'x 766, 770, n. 1 (10th Cir. 2016). The DOT specifies that eight corresponds to a worker function of "Taking Instructions—Helping," which is defined as "[a]ttending to the work assignment instructions or orders of supervisor. (No immediate response required unless clarification of instructions or orders is needed.) Helping applies to 'non-learning' helpers." *Appendix B,* 1991 WL 688701. Here, each of the jobs the ALJ identified has a "people" requirement of eight; *i.e.*, the lowest level of human interaction.  Moreover, the interaction required with supervisors only involves "attending" to orders and that no response is required unless clarification of instructions or orders is needed.  Thus, Mr. Kupfer has failed to demonstrate how this description reflects an apparent conflict that required the ALJ to elicit a reasonable explanation from the VE to resolve.

in any other way."  *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).  In this context, a

harmless error analysis would ask whether, after striking the job of mailroom clerk, the number

of jobs identified in the remaining two positions are still so numerous that a reasonable factfinder

would be compelled to find that they exist in significant numbers in the national economy.  *Id.*;

*Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009).  In *Allen*, the Tenth Circuit warned

that a harmless-error determination, *i.e.,* "deciding in the first instance that a particular number

was significant under the circumstances," is different than cases which "involved court review of

a *finding* of numerical significance *made by the ALJ*."  357 F.3d at 1144.  That is, instead of

conducting a substantial evidence review, a court performing a harmless error analysis is

essentially "supply[ing] a missing dispositive finding."  *Allen*, 357 F.3d at 1140.

      The number of remaining jobs at issue here is sufficient for application of harmless error.

Here, once the erroneous job of mailroom clerk is subtracted from the total number of jobs the

ALJ found "significant," the remaining number of jobs amounts to 164,000 in the national

economy.  The only published guidance available from the Tenth Circuit is that 1.34 million jobs

is a sufficient number to affirm on the basis of harmless error.  *Raymond v. Astrue*, 621 F.3d

1269, 1274 (10th Cir. 2009).  However, one Tenth Circuit unpublished decision indicates that

152,000 available jobs in the national economy is significant as a matter of law.  *Stokes v.

Astrue*, 274 F. App'x 675, 684 (10th Cir. 2008) (distinguishing *Allen* and *Trimiar*[12] where 100

and 650-900 statewide available jobs, respectively, were insufficient to show that work existed in

significant numbers).  Other Tenth Circuit unpublished decisions also have held harmless an

---

[12] *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992).

ALJ's erroneous inclusion of some jobs where there remained a significant number of other jobs in the national economy far lower than the 1.34 million jobs identified in *Raymond*.  *See Bainbridge v. Colvin*, 618 F. App'x 384, 391-92 (10th Cir. 2015) (500,000 jobs); *Shockley v. Colvin*, 564 F. App'x 935, 940-41 (10th Cir. 2014) (215,000 jobs); and *Chrismon v. Colvin*, 531 F. App'x 893, 899-900 (10th Cir. 2013) (212,000 jobs).  Finally, in *Evans v. Colvin*, 640 F. App'x 731, 736 (10th Cir. 2016) (unpublished), the Tenth Circuit explained that while "there is no bright-line answer to how many jobs are enough for the court to say, as a matter of law, that the number is significant, [] the number appears to be somewhere between 100, the number of jobs in *Allen* that we refused to consider significant for harmless-error purposes, and 152,000, the lowest number of jobs we considered (in *Stokes*) to be sufficient so far for application of harmless error.").  Persuasive Tenth Circuit case law, therefore, supports that the number of jobs available here is sufficient for application of harmless error.

In sum, the Court does not believe any reasonable factfinder, having followed the correct analysis, could have determined that suitable jobs do not exist in significant numbers in this case. The Court, therefore, finds that the ALJ's error in failing to resolve the conflict between the VE's testimony and the DOT with respect to the mailroom clerk position is harmless.

### B. The ALJ Applied the Correct Legal Standard in Evaluating the Medical Opinion Evidence

Mr. Kupfer next argues that the ALJ failed to mention or consider whether treating psychiatrist Yvonne Hall, M.D.'s opinions that postdate Mr. Kupfer's last date of insured are consistent with the evidence of record that predates Mr. Kupfer's incarceration.  Doc. 16 at 18. Mr. Kupfer argues that records from the relevant period contain numerous instances of abnormal mental status including psychomotor retardation, slowed speech, depressed mood, slightly

tangential thinking, and alertness/judgment/insight that are only fair.  *Id.*  Mr. Kupfer argues that had the ALJ meaningfully considered the consistency of Dr. Hall's 2020 opinions with the medical evidence from the relevant period of time, he likely would have found Mr. Kupfer disabled.  *Id.*

The Commissioner contends that the ALJ evaluated the persuasiveness of Dr. Hall's opinion evidence in accordance with the relevant legal standards and found that Dr. Hall's opinion regarding Mr. Kupfer's ability to do work-related mental activities was rendered well outside the date of Mr. Kupfer's last insured, that Dr. Hall's opinion specifically stated it related to the "current time" when it was rendered, and that the limited evidence in the file from Dr. Hall that pertains to the relevant time frame does not contain objective findings that support the degree of limitations Dr. Hall assessed after Mr. Kupfer's date of last insured.  Doc. 23 at 16-17. The Commissioner further contends that the ALJ's statement comparing the limited evidence during the relevant time with Dr. Hall's 2020 opinion evidence demonstrates the ALJ accounted for consideration of the "consistency" factor under the new rules.  *Id.* at 18.

In his Reply, Mr. Kupfer reasserts his argument that the ALJ failed to compare Dr. Hall's postdated 2020 opinion with evidence from the relevant period of time to determine whether they were consistent.  Doc. 24 at 4.  Mr. Kupfer further asserts that the Commissioner's argument is a "classic attempt at *post-hoc* rationalization that should be ignored by this Court."  *Id.*

### 1.  <u>Legal Standards</u>

An ALJ evaluates the persuasiveness of medical opinions based on: (1) the degree to which the opinion is supported by objective medical evidence and supporting explanation; (2) how consistent the opinion is with other evidence in the record; (3) the source's treating relationship with the claimant (i.e., how long/frequently the source treated the claimant and for

what purpose); (4) whether the source was specialized on the impairment on which he or she is opining; and (5) any other factor tending to support or contradict the opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The most important factors are "supportability ... and consistency." 20 C.F.R. §§ 404.1520c(a), §§416.920c(a). The SSA does not give "any specific weight, including controlling weight, to any medical opinion(s)." *Id.*

In considering the persuasiveness of medical opinions, the ALJ "must discuss the weight he assigns." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). The ALJ is not required to discuss each factor articulated in the regulations; rather, the ALJ must merely explain his weighing decision with sufficient specificity so as to be capable of review. *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). Put differently, if an ALJ rejects an opinion, he "must then give 'specific, legitimate reasons for doing so.' " *Id.* (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)).

In the face of a retrospective assessment, "the relevant analysis is whether the claimant was actually disabled prior to the expiration of [his] insured status . . . . A retrospective diagnosis without evidence of actual disability is insufficient. This is especially true where the disease is progressive." *Potter v. Secretary of Health & Human Services*, 905 F.2d 1346, 1348-49 (10th Cir. 1990). As such, there must be evidence of actual disability prior to Mr. Kupfer's date of last insured.

> Evidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to have been present and to have imposed limitations as of the earning requirement date.

*Baca v. Dep't of Health & Human Servs.*, 5 F.3d 476, 479 (10th Cir. 1993) (remanding in part because ALJ ignored evidence from before and after claimant's date last insured in finding there was no probative medical evidence documenting disability during the relevant time period) (quoting *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 42 (2d Cir. 1972)).  The key is that the subsequent evidence must bear upon the severity of Mr. Kupfer's impairments during the period between the onset date and the date last insured.  This nexus is established by evidence from which it could reasonably be presumed that the limitations existed prior to the expiration of the insured status.  *Baca,* 5 F.3d at 479.  When there is no evidence in the record suggesting that a claimant has experienced a disabling impairment during the insured period, subsequent evidence, including a physician's retrospective diagnosis, is insufficient.  *Coleman v. Chater*, 58 F.3d 577, 579 (10th Cir. 1995).

### 2.      **Relevant Medical Evidence**

#### a.      **Yvonne Hall, M.D.**

On August 6, 2013, Mr. Kupfer established care with Psychiatrist Yvonne Hall, M.D.  Tr. 701-02.  Mr. Kupfer reported being involved in criminal proceedings that started in 1997 over taxes and that he was currently working as a handy man.  *Id.*  He reported, *inter alia*, having panic attacks triggered around his case, having a hard time getting out of bed, suffering from insomnia and nightmares, worrying constantly, and feeling like he has no future.  *Id.*  Mr. Kupfer reported drinking wine and spirits every evening for the previous two months.  *Id.*  Mr. Kupfer reported no prior psychiatric treatment.  *Id.*  On mental status exam, Dr. Hall indicated Mr. Kupfer was well groomed, pleasant and cooperative; had normal speech and thought process; had good judgment and insight; had adequate attention, concentration, language and

fund of knowledge; and had a "tired" and "anxious" mood.  Tr. 703.  Dr. Hall assessed bipolar

disorder and PTSD and prescribed Lamotrigine.  *Id.*

On August 27, 2013, Mr. Kupfer saw Dr. Hall again and reported "doing O.K."  Tr. 694.

Mr. Kupfer reported improved mood and energy with Lamotrigine, but that he was still having

nightmares and anxiety.  *Id.*  Mr. Kupfer discussed his impending criminal sentencing related to

his tax fraud case.  *Id.*  On mental status exam, Dr. Hall indicated that Mr. Kupfer was well

groomed, pleasant and cooperative; had normal speech; had relevant, rational and goal-directed

thought process; had good judgment and insight; had adequate attention, concentration, language

and fund of knowledge; and had a "tired" and "anxious" mood.  Tr. 695.  Dr. Hall assessed

bipolar disorder and PTSD and added Buspirone to Mr. Kupfer medication therapy.  *Id.*

Mr. Kupfer saw Dr. Hall again on September 4, 2013, September 17, 2013,

November 18, 2013, and December 20, 2013.  Tr. 691-92, 688-90, 685-87, 683-84.  On

September 10, 2013, Dr. Hall prepared a letter to District Judge William P. Johnson in which she

stated that Mr. Kupfer has diagnoses of PTSD and bipolar II disorder (mild form of bipolar) and

was taking Lamotrigine and Buspirone.  Tr. 287.

Mr. Kupfer was incarcerated from January 8, 2014 through November 1, 2019.

On March 16, 2020, Mr. Kupfer returned to Dr. Hall for mental health treatment and the

Administrative Record reflects he sought treatment with her through November 23, 2021.  Tr.

482-516, 630-46.  On March 16, 2020, Dr. Hall added a diagnosis of obsessive-compulsive

disorder ("OCD").  Tr. 516.  Her diagnoses of bipolar II disorder, PTSD and OCD remained

unchanged throughout the remaining course of treatment reflected in the Administrative Record.

Tr. 482-516, 630-46.

On May 5, 2020, Dr. Hall prepared a "To Whom It May Concern" letter indicating that she saw Mr. Kupfer on March 16, 2020, following his release from prison and had seen him a total of four appointments.  Tr. 337.  She stated, "[i]n my opinion, he is unable to work *at the current time* due to his poor memory, concentration, paranoia, lack of energy, depression, anxiety, panic attacks, fear of being around other people.  I have advised him to apply for social security disability."  *Id.* (emphasis added).

On August 26, 2020, Dr. Hall prepared a Mental Residual Functional Capacity Questionnaire on Mr. Kupfer's behalf.[13]  Tr. 401-02.  Dr. Hall indicated diagnoses of bipolar II disorder, PTSD and OCD.  *Id.*  She assigned a current GAF score of 40 and 50 for the past year.[14]  *Id.*  She listed Mr. Kupfer's prescribed medications as Aripiprazole, Fluoxetine, Trazodone, Benztropine, Lamotrigine, and Buspirone.  *Id.*  Dr. Hall noted Mr. Kupfer's clinical findings as depressed mood, psychomotor retardation, obsessive thoughts, lack of mental flexibility, thoughts of worthlessness, and unkempt appearance.  *Id.*  She assessed that Mr. Kupfer was seriously limited, but not precluded from interacting appropriately with the general public, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness; traveling in unfamiliar places; and using public transportation.  *Id.*

---

[13] There is no indication on this form that Dr. Hall's assessment of Mr. Kupfer's ability to do work-related mental activities related to a date prior to his date of last insured.

[14] The GAF is a subjective determination based on a scale of 100 to 1 of a "clinician's judgment of the individual's overall level of functioning."  *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32.  A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job).  *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 34.  A GAF score of 31-40 indicates impaired reality testing (psychosis) or communication or major impairment in work or school, family relations, judgment, thinking, or mood.  *Id.*

b.    **Lisa Mctavis, LMSW**

On July 29, 2013, Mr. Kupfer presented to Lisa Mctavis LMSW and reported anxiety, depression and heightened frenzied mood states.[15]   Tr. 699-700.  Mr. Kupfer reported having decreased energy and motivation and being unable to meet requirements at work and home.  *Id.*  Mr. Kupfer also reported difficulty sleeping and trouble focusing.  *Id.*   LMSW Mctavis indicated she would refer Mr. Kupfer to "Jimmy" for medication management and underreported drinking, and she established treatment goals of learning new coping strategies.  *Id.*

Mr. Kupfer next saw LMSW Mctavis on August 7, 2013.  Tr. 698. On mental status exam, LMSW Mctavis indicated Mr. Kupfer had slow speech and a depressed mood; slightly tangential thought form; fair alertness, concentration, insight and judgment; and good recent and remote memory.  *Id.*  LMSW Mctavis noted that Mr. Kupfer discussed Dr. Hall's diagnoses and the session was focused on helping Mr. Kupfer anticipate and manage his bipolar diagnosis and symptoms.  *Id.*

Mr. Kupfer saw LMSW Mctavis again on August 14, 2013.  Tr. 697.  On mental status exam, she indicated Mr. Kupfer was well dressed; had little eye contact and slow speech; had clear and organized thoughts; fair alertness, concentration, insight and judgment; and good recent and remote memory.  *Id.*  LMSW Mctavis noted that Mr. Kupfer spent most of the session processing details of his court experiences and anticipated sentencing.  *Id.*

Mr. Kupfer last saw LMSW Mctavis on August 21, 2013.  Tr. 696.  On mental status exam, she indicated Mr. Kupfer was well dressed; had little eye contact and slow speech; had

---

[15] LMSW Mctavis was associated with Dr. Hall's practice.

clear and organized thoughts; had fair alertness, concentration, insight and judgment; and had

good recent and remote memory. *Id.*  LMSW Mctavis noted that Mr. Kupfer spent the session

discussing court sentencing and appeal process. *Id.*

### 3.  Analysis

The ALJ thoroughly discussed the sparse medical evidence record *prior* to Mr. Kupfer's

date of last insured as follows:

> Records in the file show the claimant underwent treatment with psychiatrist,
> Yvonne Hall, M.D., prior to and after his date last insured (Exs. 1F, 9F, 17F, 18F).
> Although Exhibit 1F is labeled in the claimant's file as "Treating Source Statement
> – Yvonne Hall, M.D.," it merely contains copies of prescriptions and letters from
> Dr. Hall (Ex. 1F).  Dr. Hall's letters do not set forth specific opinions regarding
> functional limitations (Id.).  Dr. Hall's September 10, 2013 letter stated the claimant
> was her patient, that he had "a diagnosis of post-traumatic stress disorder and
> bipolar II (mild form of bipolar)", and that he was receiving prescriptions for
> Lamotrigine and Buspirone (Ex. 1F/1).  Because Dr. Hall's September 10, 2013
> letter did not contain any specific opinions regarding functional limitations, it is
> unnecessary for the undersigned to assess its level of persuasiveness.  The
> undersigned considered the notations Dr. Hall included in this letter, but finds it, as
> well as the below referenced 2013 records from Dr. Hall do not set forth any
> objective findings that would support a finding of disability prior to the claimant's
> date last insured.
>
> The undersigned notes that after the December 21, 2021 hearing, the claimant's
> attorneys submitted new records from Dr. Hall, which range in date from July 29,
> 2013 to December 20, 2013, that they support the finding that [claimant] had severe
> mental health impairments prior to the date last insured, but fail to show the
> claimant's impairments created functional limitations that rise above those adopted
> in this decision during the relevant period of adjudication.   The undersigned
> admitted these records and they are now exhibited at Exhibits 18F, 19F.[16]
>
> Dr. Hall's records from 2013 indicated the claimant had been indicted on charges
> related to taxes and that he was sentenced to 10 years in Federal prison (Ex. 19F).
> Dr. Hall's records from 2013 indicated the claimant reported experiencing high
> levels of stress; sadness associated with being away from his son and wife; and
> numerous symptoms affiliated with anxiety, panic attacks, depression, and post-

---

[16] Exhibit 19F includes the four records generated by LMSW Lisa Mctavis.  Tr. 696-99, 704.

traumatic stress disorder (Id.).   Dr. Hall's 2013 records set forth diagnostic impressions of other bipolar disorders and PTSD and indicated the medications Buspirone and Lamotrigine were prescribed to treat the same (Id.).  Dr. Hall's 2013 reports indicated the claimant presented with mental status examination abnormalities such as slow speech and motor activity; depressed appearance; tired, anxious, reactive, and depressed mood; difficulty staying on topic at times; some loss of remote memory; slight tangential thought form; and thought content around situation (Id.).  However, Dr. Hall's 2013 reports also set forth numerous normal findings such as: well groomed, pleasant, and cooperative; gait and station within normal limits; spontaneous speech of normal tone, volume and rate; relevant, rational and goal-directed thought process; intact associations; good judgment and insight; orientation in 4 spheres, good recent and remote memory; and adequate attention and concentration (Id.).

Tr. 23-24.  The record supports these findings.  *See* Section III.B.2, *supra*.  Moreover, it is clear from this discussion that the ALJ considered the very symptoms from Dr. Hall's and LMSW Mctavis' treatment notes that Mr. Kupfer alleges the ALJ ignored.

As for the medical evidence created *after* Mr. Kupfer's date of last insured, the ALJ discussed Dr. Hall's treatment records; Dr. Hall's May 4, 2020, opinion that Mr. Kupfer was unable to work *at the current time*; and Dr. Hall's August 26, 2020, mental residual functional capacity questionnaire.  Tr. 24-25.  The ALJ also discussed treatment notes and opinion evidence prepared by Mr. Kupfer's treating psychologist Laura Ferrell, Ph.D.  Tr. 25.  The ALJ concluded, however, that while later records with dates of service well beyond Mr. Kupfer's date of last insured show that Mr. Kupfer experiences significant mental as well as physical issues, "they do not persuasively relate back prior to the date last insured of June 30, 2015, *because the file does not contain objective findings that support a finding of disability prior to that time*."  *Id.* (emphasis added).  The ALJ ultimately concluded that the medical evidence in the record prior to Mr. Kupfer's date of last insured was insufficient to establish that his impairments were severe enough to prevent him from performing all work-related activity.  *Id.*  Rather, the ALJ

determined that the record showed that Mr. Kupfer could perform a reduced range of light work during the relevant period of time.  *Id.*

Based on the foregoing, the Court is not persuaded that the ALJ failed to compare Dr. Hall's 2020 opinions with evidence from the relevant period of time as Mr. Kupfer argues. As noted above, the ALJ stated that while later records with dates of service well beyond Mr. Kupfer's date of last insured show that Mr. Kupfer experiences significant mental as well as physical issues, "they do not persuasively relate back prior to the date last insured of June 30, 2015, *because the file does not contain objective findings that support a finding of disability prior to that time*."[17]  *Id.* (emphasis added).  Thus, the ALJ did not ignore the evidence before or after Mr. Kupfer's date of last insured.  Further, the ALJ properly considered whether certain limitations existed prior to the expiration of Mr. Kupfer's insured status and whether the subsequent evidence supported a disabling impairment during the insured period as he was required to do.  The Court, therefore, finds no error.

Moreover, Mr. Kupfer's argument ignores that Dr. Hall's 2020 opinion evidence did not make a retrospective assessment of Mr. Kupfer's ability to work and/or perform work-related mental activities or suggest that Mr. Kupfer experienced a disabling impairment during the relevant period of time.  Instead, Dr. Hall's opinion evidence explicitly related to the current time, *i.e.,* May and August of 2020, a full five years *after* Mr. Kupfer's date of last insured.

---

[17] Mr. Kupfer asserts that the Commissioner's characterization of this statement as demonstrating the ALJ accounted for consideration of the "consistency" factor under the new rules amounts to *post-hoc* rationalization.  The Court does not agree.  The Commissioner accurately represented the ALJ's discussion in its briefing regarding the ALJ's consideration of the pre- and post-dated medical evidence.

Mr. Kupfer's argument, therefore, attempts to build a bridge between the five year gap in medical record evidence that Dr. Hall herself chose not to do.

Lastly, the ALJ did not make a determination that Mr. Kupfer became or was disabled *after* the date of last insured based on the medical evidence record that postdates Mr. Kupfer's date of last insured.  Thus, Mr. Kupfer's argument that the ALJ would have found Mr. Kupfer disabled had the ALJ meaningfully considered whether Dr. Hall's postdated opinions were consistent with medical record evidence from the relevant period of time is misplaced and based on a presumed finding that does not exist in the record.

In sum, the Court finds no error with the ALJ's discussion and consideration of the medical opinion evidence.

### IV.  Conclusion

For the reasons stated above, Mr. Kupfer's Motion for Remand (Doc. 16) is **DENIED.**

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge,**
**Presiding by Consent**